NOT DESIGNATED FOR PUBLICATION

No. 129,242

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of S.T.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Submitted without oral argument. Opinion filed July 2, 2026. Affirmed.

*Richard W. Martin Jr.*, of Martin Law Group, LLC, of Leawood, for appellant.

*Madison M. Hatten* and *J. Eugene Balloun*, of Shook, Hardy & Bacon L.L.P., of Kansas City, Missouri, for appellees.

Before ARNOLD-BURGER, P.J., MALONE and PICKERING, JJ.

PER CURIAM: Mother appeals the termination of her parental rights and the adoption of her child, S.T., by the child's paternal grandparents (Grandparents). She asserts the district court erred because it did not consider all relevant surrounding circumstances as required by K.S.A. 59-2136(h)(2) before terminating her parental rights. Mother also contends the district court substituted an analysis of the child's best interests for the statutory grounds for termination of parental rights under K.S.A. 59-2136(h)(1). After review, we find clear and convincing evidence supports the district court's findings and the district court correctly considered all relevant surrounding circumstances. We also find that the district court did not consider S.T.'s best interests until after making findings under K.S.A. 59-2136(h)(1). Accordingly, we affirm the termination of Mother's parental rights and the decree of adoption.

1

S.T. was born in October 2014 and has had several medical issues since birth. S.T. received a heart transplant at age two. She has since been diagnosed with autism spectrum disorder, unspecified trauma and stressor related disorder, and attention deficit hyperactivity disorder. She has been hospitalized several times for severe kidney infections.

On October 25, 2023, Grandparents, who reside in Johnson County, Kansas, filed a petition for adoption. The petition alleged that an Illinois court granted Father temporary custody of S.T. shortly after she received a heart transplant in 2016. S.T. has resided with Grandparents since 2016. Grandparents alleged that Mother had failed to make an effort to support or communicate with S.T., had failed to assume the duties of a parent for more than two consecutive years, and had had no contact with S.T. since 2017. Grandparents requested that Mother's parental rights be terminated and they be allowed to adopt S.T.

Mother answered the petition and objected to the termination of her parental rights. She contended that she had attempted to locate Father and S.T. since 2016 "to no avail." She alleged that she had made a "real and continuing effort to assume parental duties over the minor child for more than the last two years." Mother also asserted that her "reasonable efforts to provide for her child's welfare failed because of interference of the father and [Grandparents]," so the district court should not terminate her parental rights.

The case proceeded to a two-day evidentiary hearing. The parties agreed to admit more than 100 exhibits by stipulation.

Grandmother testified that Grandparents first met S.T. in the winter of 2015. They were only able to spend a few hours with S.T. Before this time, Mother had not allowed Grandparents to see S.T. or know where Mother and S.T. lived. Grandparents and Father went to court in March 2016 in Illinois for emergency visitation because Mother would not allow Father to visit S.T. in the hospital.

In October 2016, Father returned to Illinois for a custody hearing and was awarded custody of S.T. At the time, Father lived with Grandparents in Olathe. Since S.T.'s second birthday, she has never lived with Mother. Grandmother has been S.T.'s primary caregiver since age 4.

Beginning in October 2016 and continuing through December 2016, S.T. had Skype calls with Mother every weekday. In December 2016, the Illinois court entered a no-contact order prohibiting Mother from contacting Father, any of his family, or S.T.'s health care providers and temporarily suspending the Skype visitation. In April 2017, Mother moved to reinstate her parenting time, and the Illinois court granted her supervised parenting time.

Grandmother testified that S.T.'s last communication with Mother occurred on S.T.'s third birthday in 2017. Grandparents lost contact with Mother after May 2019 because they were never allowed to have her address. Grandmother admitted that she did not look for Mother until filing the petition for adoption.

Father testified next. He confirmed that he was S.T.'s father. Mother was ordered to pay $280 per month in child support. But Mother has never paid child support (though the maternal grandmother made three child support payments on Mother's behalf). Mother owed $30,000 in child support and attorney fees.

Father and Mother were directed by the Illinois court to use Talking Parents. Father explained that Talking Parents is a parenting app that logged when messages were viewed. The last time Mother sent him a message through the app was in October 2017. Father indicated that he would have cooperated with setting up a supervised visit, as the court order required, if Mother had reached out.

Father stopped using Talking Parents after Mother stopped checking for messages. He testified that Mother never attempted to find S.T.'s new address or provide her own new address. Father consented to the adoption by Grandparents.

Elizabeth Vostrez, the clinical director of Lifework's Family Treatment Group, testified next. She explained that S.T. has "a very strong attachment" to her Grandparents. Vostrez also testified that Grandparents "have gone above [and] beyond of typical parenting in order to meet the very specific needs of this child." She believed adoption by Grandparents was in S.T.'s best interests.

Grandfather testified that he had a close relationship with S.T. Grandfather acknowledged that they had very little contact with Father. He also explained that he did not notify Mother when they moved to their current residence and has never reached out to Mother. Grandfather testified that they were able to meet S.T.'s needs with their own financial resources.

After Grandfather's testimony, Grandparents rested.

Mother testified on her own behalf. She explained that her move to California in 2013 was unrelated to Father, and Father initiated contact once she was in California. She alleged many instances of domestic violence between Mother and Father and alleged S.T. was a child of rape.

Mother first learned that S.T. had heart issues during Mother's pregnancy. At the time of S.T.'s birth, Mother had a protection order against Father but dropped the protection order shortly before birth. Father did not visit S.T. after her birth. Ultimately, a California court granted Mother full custody in 2016.

Mother explained that she had not been opposed to Father seeing S.T. while S.T. was in the hospital in Chicago. She blamed the hospital for refusing to follow the court's orders.

Mother testified that she was not happy when the Illinois court gave Father temporary custody of S.T. Afterward, she initially participated in Skype visits. She also tried to complete mental health assessments and evaluations as ordered by the Illinois court. She continued to participate in therapeutic services in Illinois for a year or two.

Mother did not believe the Skype calls occurred as they were supposed to. Father or Grandparents facilitated the Skype calls, but the call could not always occur if, for example, S.T. was already in bed. Mother explained that she did not call the Kansas Department for Children and Families (DCF) but that S.T.'s pediatrician and Mother's therapist made the calls reporting Father to DCF. The no-contact order entered by the Illinois court restricted Mother's ability to contact Father or Grandparents.

As a result, Mother was only able to receive updates through the Talking Parents app. Mother denied not looking at Talking Parents app, though admitted that she would not open every individual feed; instead, Mother testified, she would sometimes request the whole transcript and "read it that way." She did not believe she had any way to communicate with Father to request updates. She testified that her Illinois attorneys advised that if she messaged anyone in Father's family, she would end up in jail.

Mother testified that the district court modified the no-contact order, providing for a second supervised visit, but the visit never occurred because she was unable to travel and Father refused to bring S.T. to Illinois to see her. Mother had fallen off a ladder and was temporarily wheelchair bound.

Mother testified that she has not worked in years and had no money with which to pay child support. She has not been able to pay child support to Father at any point after the Illinois court awarded him child support. She receives $934 per month as SSI disability payments. She began receiving SSI payments in 2021.

Mother testified that she became concerned with the lack of updates on the Talking Parents app and began searching Facebook and Google for Father or his family. She believed S.T. was living with Father, not Grandparents. Mother was not notified of any of Father's moves. She believed that the no-contact order was still in effect with one exception—the ability to contact Father for a Skype visit after the Illinois guardian ad litem approved of her mental health treatment. She had no access to any of Father's family's phone numbers because a prior husband "locked [her] out of [her phone] for 50 years." Regardless, she did not believe that any member of Father's family would have helped her locate S.T. Mother testified that she and maternal grandmother "called over 100 different lawyers and law firms" in Kansas to regain contact with S.T.

Mother admitted that she was not currently capable of meeting S.T.'s needs. Had Grandparents filed a petition for guardianship over S.T., Mother "would sign in a heartbeat." But Mother also wanted to be in S.T.'s life "as a regular and stable person she can come to." Mother was hurt that Grandparents had not shown S.T. a picture of her or talked about her. She explained that she did not believe her failure to be in S.T.'s life was for a lack of trying. Nor did Mother believe her inability to provide financial support was intentional. Still, Mother believed that it was in S.T.'s best interests to live with Grandparents.

6

Mother is married and has lived in Sherman, New York, since 2022. She and her husband have three children together. In May 2023, Mother graduated from Harvard Extension School with a Master's degree in liberal arts and legal studies. She currently has approximately $94,000 in debt.

S.T.'s maternal grandmother testified. She paid most of the litigation costs for the Illinois court case. She explained that she also contacted different lawyers to discuss options to find Father and S.T. Mother expressed frustration with the no-contact order preventing her from reaching out to Father and his family. Despite maternal grandmother's help, Mother was never able to locate Father.

After the close of evidence, the district court offered the parties the opportunity to submit written closing arguments.

The district court's order noted that Grandparents "have spent a great deal of time and effort offering evidence and argument suggesting [Mother] was an unfit parent due to mental health issues and failed relationships, although no such claim is made in their Petition." Although there were mental health and domestic violence struggles in Mother's past, "the Court cannot find by clear and convincing evidence that [Mother] is an unfit parent." Instead, the district court agreed with the Illinois court that Mother did a "'phenomenal'" job caring for S.T.'s health issues before her parenting time was suspended.

The district court found that Mother "'has failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the Petition'" because Mother had not taken advantage of the opportunity for supervised visits and Skype calls with S.T. The district court noted that Mother had scheduled other hearings after the no-contact order but had not suggested Father or Grandparents "thwarted her attempt to exercise her rights to visit and maintain contact with [S.T.]."

The district court found by clear and convincing evidence that Mother had abandoned or neglected S.T. because the undisputed evidence showed Mother had no contact with S.T. for almost eight years. Similarly, the district court found by clear and convincing evidence that Mother made no reasonable efforts to provide support for, or communicate with, S.T. because Mother had not paid child support or contacted S.T. in nearly eight years. Finally, the district court found that Mother had failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition.

The district court noted that it considered S.T.'s "special needs and her fragile condition in arriving at its decision to terminate [Mother's] parental rights and grant the Petition for Adoption." The district court terminated Mother's and Father's parental rights and granted the petition for adoption.

Mother appealed.

ANALYSIS

On appeal, Mother raises three issues. First, she suggests the district court misapplied the statutory factors and failed to properly account for the relevant surrounding circumstances when it terminated her parental rights. Next, she argues that the district court "improperly discounted evidence of barriers to communication and contact" in finding the statutory factors applied. Finally, Mother contends that the district court "impermissibly" substituted S.T.'s special needs, her best interests, and stability for missing statutory elements.

*Standard of Review*

When a district court terminates parental rights based on factual findings made under K.S.A. 59-2136(h)(1), those factual findings will be reviewed on appeal to determine whether, after viewing all of the evidence in the light most favorable to the prevailing party, the findings were supported by clear and convincing evidence. See *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. 311 Kan. at 806.

*Discussion*

The United States Constitution's Due Process Clause provides substantive protection for parents when they have assumed parental duties. *In re Adoption of G.L.V.*, 286 Kan. 1034, 1060, 190 P.3d 245 (2008). Adoption statutes are strictly interpreted in favor of maintaining the rights of the natural parents where the statute is being used to terminate the right of a natural parent without consent. *In re Adoption of C.L.*, 308 Kan. 1268, 1279-80, 427 P.3d 951 (2018). Although public policy favors maintaining the rights of a natural parent in the case of a nonconsensual adoption, when "a parent has not 'accept[ed] some measure of responsibility for the child's future,' the [law] does not protect a merely biological relationship." *In re Adoption of G.L.V.*, 286 Kan. at 1060.

Under K.S.A. 59-2136(h)(1), a petitioner in an adoption proceeding has "the burden of proving by clear and convincing evidence that termination of parental rights is appropriate." *In re Adoption of B.B.M.*, 290 Kan. 236, 243, 224 P.3d 1168 (2010). The party seeking to terminate a parent's rights has the burden of proving by clear and convincing evidence that termination is appropriate under K.S.A. 59-2136. *In re Adoption of C.L.*, 308 Kan. at 1278.

I. *Because the district court did not misapply K.S.A. 59-2136(h)(1)(G), we need not address K.S.A. 59-2136(h)(1)(A) or (C).*

Under K.S.A. 59-2136(h)(1)(G), the district court may terminate parental rights after finding by clear and convincing evidence that "the father has failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition."

Under K.S.A. 59-2136(b), "the provisions of this section applicable to the father also shall apply to the mother . . . ." In determining whether parental rights should be terminated, the district court "[s]hall consider all of the relevant surrounding circumstances" and "may disregard incidental visitations, contacts, communications or contributions." K.S.A. 59-2136(h)(2). Further, the statute defines "'support'" as "monetary or non-monetary assistance that is reflected in specific and significant acts and sustained over the applicable period." K.S.A. 59-2136(h)(4).

On appeal, Mother argues that the district court's journal entry "largely converted the subsection (G) inquiry into a time-elapsed analysis—emphasizing almost eight years without contact and concluding Mother has not been a parent to S.T. for more than two years." She complains that this collapsed the analysis into a "purely chronological 'absence' metric" without considering whether the surrounding circumstances reflected "'refusal.'" Mother's argument is not persuasive for two reasons.

First, K.S.A. 59-2136(h)(1)(G) contains a chronological component. The district court may terminate parental rights after finding by clear and convincing evidence that a parent "has failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition." K.S.A. 59-2136(h)(1)(G). "When a statute is clear and unambiguous, appellate courts give effect to legislative intent expressed through the words of the statute, rather than make a determination of what the

10

law should or should not be." *Carlson Auction Service, Inc. v. Kansas Corporation Comm'n*, 55 Kan. App. 2d 345, 349, 413 P.3d 448 (2018). Mother's assumption of parental duties before October 25, 2021—the date two years preceding the filing of the petition—are irrelevant to an analysis under K.S.A. 59-2136(h)(1)(G); only her efforts after October 25, 2021, are relevant. The district court did not misapply K.S.A. 59-2136(h)(1)(G); it properly considered the appropriate time frame.

Second, the district court considered the relevant surrounding circumstances as required by K.S.A. 59-2136(h)(2), including Mother's failure to take necessary steps to exercise her parental rights. "[A] natural parent's right to raise his or her child is protected to the extent that the parent demonstrates a commitment to his or her parental responsibilities." *In re Adoption of G.L.V.*, 286 Kan. at 1059. Here, Mother was not committed to her parental responsibilities.

Other panels of our court have affirmed the district court's termination of parental rights in similar circumstances. In *In re Adoption of M.B.*, No. 128,124, 2025 WL 1419875, at *5-6 (Kan. App. 2025) (unpublished opinion), another panel of this court affirmed the termination of parental rights under K.S.A. 59-2136(h)(1)(G) when the father engaged in a parentage action, attended the children's first communion, and "thought he had parenting time coming" but did not have phone contact with the children because, he alleged, the mother blocked his cell phone number and because he had almost no visitation with the children. And in *In re Adoption of D.A.*, No. 128,193, 2025 WL 1010532, at *1, *4, (Kan. App. 2025) (unpublished opinion), another panel of this court addressed a similar argument—that father believed he was prohibited from having contact under a temporary ex parte order—and ultimately concluded that his failure to properly read that order did not excuse a failure to exercise his parental rights and affirmed.

11

Here, the district court noted that the Illinois district court provided Mother with an opportunity to resume supervised visits and Skype calls with S.T., but Mother took no steps to exercise these parental rights. The district court added that Mother did not address Father's alleged attempts to thwart Mother's exercise of her parental duties in Illinois court despite having hearings on other matters after July 2017, including a show-cause hearing alleging Father stopped providing updates in late 2017. Finally, we note that Mother messaged Father on the Talking Parents app to discuss a Skype visit for S.T.'s third birthday despite the no-contact order but made no subsequent attempts to arrange visitation or Skype calls.

Mother's argument essentially asks us to reweigh her testimony about her understanding of the no-contact order, something we cannot do. See *In re Adoption of Baby Girl G.*, 311 Kan. at 806. Clear and convincing evidence supports the district court's determination that Mother failed or refused to assume her parental duties for two consecutive years immediately preceding the filing of the adoption petition.

Because we find clear and convincing evidence supports the district court's findings under K.S.A. 59-2136(h)(1)(G), we find it unnecessary to address the district court's findings under K.S.A. 59-2136(h)(1)(A) or (C). See K.S.A. 59-2136(h)(1) (court may order parental rights be terminated after finding by clear and convincing evidence *any* of the listed factors); *In re Adoption of P.Z.K.*, 50 Kan. App. 2d 617, 622, 332 P.3d 187 (2014).

II.     *The district court did not grant the adoption based solely upon S.T.'s special needs and a best interests of the child analysis.*

Mother argues that the best interests of a child or the child's special needs "cannot substitute for proof of statutory grounds" for termination. She acknowledges that the child's best interests may be considered as part of the surrounding circumstances but is

12

not "an independent ground" and cannot "replace missing [statutory] elements." She complains that the journal entry and memorandum "placed heavy emphasis on the child's complex medical and psychological needs and the stability provided by [Grandparents], and found adoption in the child's best interests."

The district court, however, did not substitute a best interests of the child analysis for the statutory factors allowing for termination of Mother's parental rights. Before engaging in a best interests analysis, the district court found by clear and convincing evidence that Mother abandoned or neglected S.T., made no reasonable effort to support or communicate with S.T., and failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the adoption petition. Only after making those statutory findings did the district court consider whether termination of Mother's parental rights was appropriate. It considered S.T.'s best interests, her special needs, and her fragile condition as part of the "relevant surrounding circumstances" supporting termination of parental rights, but it did not consider these factors instead of K.S.A. 59-2136(h)(1)(G). And, as earlier discussed, clear and convincing evidence supports the district court's findings.

The district court did not consider S.T.'s best interests, her special needs, or her fragile state instead of the statutory factors supporting termination of parental rights. It did not err.

*Conclusion*

The district court found that Mother had abandoned or neglected S.T. It also found that Mother made no reasonable efforts to support or communicate with S.T. Finally, the district court found that Mother failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the adoption petition. In making these findings, the district court considered, but did not replace the statutory factors with,

13

S.T.'s best interests, including her special needs and fragile state. The district court did not err when it terminated Mother's parental rights and granted the decree for adoption.

Affirmed.